UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| 211 WAUKEGAN, LLC, ) | No. 11 B 13104 |
| ) | Chapter 11 |
| Debtor. ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
REGARDING BEA KABBANI'S MOTION
REQUESTING PAYMENT OF ADMINISTRATIVE EXPENSE**

## Introduction

On March 30, 2011, 211 Waukegan, LLC ("Debtor") filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. This is a single asset real estate case. The property at issue is a three-story commercial building located in Northfield, Illinois. The Debtor purchased the real estate in 2008 for approximately $3 million in a purchase financed by Itasca Bank. The Debtor defaulted on its obligations to Itasca Bank, who subsequently obtained a default judgment of foreclosure in state court. Before a scheduled real estate sale, the Debtor filed its bankruptcy case.

The Debtor was owned, at the time of filing, by Sam Kabbani. Mr. Kabbani also managed the Debtor and was responsible for the day-to-day operation of the real estate prior to 2010. Bea Kabbani ("Kabbani") was appointed manager of the Debtor in 2011. Sam and Bea Kabbani are married to each other. In August 2010, a receiver was appointed by the state court to take over control and possession of the real estate.

On June 5, 2011, the Debtor filed its Third Amended Plan of Reorganization, which proposed a sale of the Debtor to Bea Kabbani in exchange for commitment to contribute $150,000 to fund the plan of reorganization. In order to satisfy the absolute priority rule, the Third Amended Plan provided that if a class of creditors voted to reject the plan, the Debtor would conduct an auction for the equity of the Reorganized Debtor. Itasca Bank, the sole member of Class 1 under the Third Amended Plan, voted to reject that plan. Consequently, an auction was held and Itasca Bank declared the winner by Order herein. (Dkt. No. 153) After Istaca Bank

purchased the equity of the Debtor, it supported the Fifth Amended Plan that was confirmed without objection by any creditor of the Debtor. That Plan extinguished the equity interest held by Sam Kabbani.

Following evidence and briefing on Bea Kabbani's ("Kabbani") Motion requesting payment of administrative expense as amended by order dated April 3, 2012 [dkt no. 196] (the "Motion"), and on objection by Itasca Bank ("Bank"), the following Findings of Fact and Conclusions of Law are made and entered.

### Findings Of Fact

1. Debtor filed its Chapter 11 petition on March 30, 2011 at 9:17 a.m. [dkt no. 1].

2. Debtor's Fifth Amended Plan (the "Plan") was confirmed by this Court by order dated November 15, 2011.

3. The Effective Date of the Plan was December 1, 2011 (the "Effective Date").

4. Prior to the Effective Date Kabbani was the manager of the Debtor.

5. Art. I.A.1. and Art. II.B. of the Plan provide as follows:

> I.
> A.    As used in this Plan, the following terms shall have the respective meanings specified below:
>
> 1. *"Administrative Claim"* means a Claim under section 507(b) of the Bankruptcy Code, or a Claim under section 503(b) of the Bankruptcy Code that is entitled to priority under section 507(a)(1) of the Bankruptcy Code, for costs or expenses of administration of the Chapter 11 Case including, without limitation, any actual and necessary expenses of operating the businesses of the Debtor or preserving the Estate, and any and all fees and expenses of Professionals to the extent allowed by the Bankruptcy Court under sections 330, 331, or 503 of the Bankruptcy Code.
>
> ...
>
> II.
> B.    **Treatment of Administrative Claims**. Except to the extent the Holder of an Allowed Administrative Claim agrees otherwise, each Holder of an Allowed

> Administrative Claim shall be paid in respect of such Allowed Claim the full amount thereof, without interest, in Cash, on the tenth (10th) Business Day following the later of (I) the Effective Date, or (ii) the date on which such Administrative Claim becomes Allowed by a Final Order.

6. Kabbani filed her Motion on December 30, 2011, within 30 days after the Plan Effective Date. The Motion was timely filed pursuant to Art. I.A.2. and Art. II.E. of the Plan.

7. As originally filed the Motion requested allowance of administrative expenses in the sum of $6,475.00.

8. By order dated April 3, 2012, Kabbani was granted leave to amend the Motion to include an additional $35,000.00 in administrative expense claims constituting payments Kabbani made or caused to be made that were used to pay fees and expenses incurred by the Law Offices of William J. Factor ("LOWJF"), on behalf of the Debtor.

9. The particular items for which Kabbani now seeks allowance as administrative expenses in the Motion are as follows:

| Description | Payee | Amount | Payment Cleared Drawee Bank |
|---|---|---|---|
| Fee for real estate appraisal | Peter Soukoulis | $ 4,500.00 | Pre-petition |
| LLC registration & franchise fees | Illinois Secretary of State | $ 1,400.00 | Pre-petition |
| U.S. Trustee Fees | U.S. Trustee | **$ 325.00** | **Post-petition** |
| Fee for tenant eviction | Samuel G. Levin, Esq. | **$ 250.00** | **Post-petition** |
| payment of attorneys fees | LOWJF | $10,000.00 | Pre-petition |
| payment of attorneys fees | LOWJF | **$15,000.00** | **Post-petition** (see ¶¶ 18 and 19) |
| payment of attorneys fees | LOWJF | **$10,000.00** | **Post-petition** (see ¶ 21) |
| **Total Post-Petition Payments** | | **$25,575.00** | |

10. Kabbani made or caused to be made all of the foregoing payments prior to the Plan Effective Date.

11. The services rendered by attorney Samuel G. Levin which Kabbani paid $250 were necessary for the ordinary operation of the Debtor In Possession's business. During the course of the hearing on the Motion the Reorganized Debtor stipulated to allowability of this claim as an administrative expense.

12. The payment Kabbani caused to be made to the U.S. Trustee for quarterly U.S. Trustee fees was necessary and of benefit to the Debtor In Possession. During the course of the

hearing on the Motion the Reorganized Debtor stipulated to the allowability of this claim as an administrative expense.

13. Within 30 days after the Effective Date LOWJF filed its final application for allowance of attorneys' fees for the Debtor ("LOWJF Fee Application") [dkt no. 194].

14. By order dated February 13, 2012, over Kabbani's objection, this Court entered an order agreed to by Itasca Bank and LOWJF disposing of LOWJF's Fee Application and, *inter alia*, authorizing the $35,000 in payments previously made by Kabbani to LOWJF to be applied against LOWJF's fees (the "Agreed Order"). [dkt no. 220].

15. The agreement between the Debtor and Kabbani for Kabbani to make the payments to LOWJF was made and the consequent payments to LOWJF were necessary to induce the Debtor's attorneys to render and be paid for services to and for the benefit of the Debtor In Possession.

16. Except for the sum of $2,220 applied to pre-petition legal services, all of the payments were actually applied and used to pay for legal services rendered post-petition by LOWJF to and for the benefit of the Debtor In Possession. See para. 11 of the fee application filed by LOWJF [dkt no. 194]. LOWJF as counsel for Debtor was essential to do work leading to Plan confirmation and consequent sale held at which Itasca Bank was successful bidder, leading to its present control of Debtor.

17. The Debtor In Possession and its creditors thereby actually received the benefit of Kabbani's payments, and Bank as successful bidder received the benefit of a functioning debtor able to confirm a Plan and holding a sale at which the Bank succeeded and Kabbani lost control of the business.

18. Based on the testimony heard and documents produced pursuant to subpoena by Piotr Zupinski, Sr. V.P. of Bank of America (Kabbani Exhibit 15 ordered filed under seal), it is held that the $15,000.00 check Kabbani caused to be paid to LOWJF cleared the drawee bank account at some time on March 31, 2011, the day after filing of the Bankruptcy Petition commencing the Debtor's case. See also Kabbani Exhibits 8 and 9.

19. Because the $15,000.00 check Kabbani post-petition caused to be paid to LOWJF had not cleared the drawee bank as of the filing of the Debtor's Chapter 11 petition such payment

constituted a postpetition transaction between Kabbani and the Debtor In Possession.

20. All of the payments caused to be made by Kabbani post-bankruptcy-filing for which Kabbani seeks allowance as administrative expenses were necessary expenses paid on behalf of and for the benefit of the bankruptcy estate and plan confirmation process and sale pursuant thereto.

21. The $10,000.00 check Kabbani caused to be paid to LOWJF by check dated June 29, 2011, payable to Sara E. Lorber (Kabbani Exhibit 11) was both dated and cleared the drawee bank after the filing of the Debtor's Chapter 11 petition. Such payment therefore constituted a post-petition transaction between Kabbani and the Debtor In Possession.

22. Additional Findings of Fact are contained in the Conclusions of Law and discussion that follows.

## **Conclusions Of Law**

Section 503(b)(1)(A) of Title 11 U.S.C. (the "Bankruptcy Code") provides:

> **(b)** After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
> **(1)**
> **(A)** the actual, necessary costs and expenses of preserving the estate...

Section 507(a)(2) of the Bankruptcy Code provides in part as follows:

> **(a)** The following expenses and claims have priority in the following order:
> **(2)** Second, administrative expenses allowed under section 503(b) of this title...

A claim will be afforded priority under § 503 if the debt both (1) "arise[s] from a transaction with the debtor-in-possession [i.e. post bankruptcy] and (2) is beneficial to the debtor-in-possession in the operation of the business." *In re Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir. 1984) (quoting *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976)).

The moving party bears the burden of proving that its claim is entitled to administrative

expense priority and the standard of proof is a preponderance of the evidence. *In re National Steel Corp.*, 316 B.R. 287, 300 (Bankr. N.D. Ill. 2004).

Where services are rendered by a person who would ordinarily fall within the definition of "professional person" but that are not central to the debtor's case and may nevertheless be necessary for the ordinary operation of the debtor's business, it is not always required that such individuals be employed with prior court approval or that the fees be court approved. *In re Seiling Associates Ltd. Partnership,* 128 B.R. 721, 723 (Bankr. E.D. Va. 1991); *In re Johns-Manville Corp.,* 60 B.R. 612 (Bankr. S.D.N.Y. 1986); *In re Seatrain Lines, Inc.,* 13 B.R. 980 (Bankr. S.D.N.Y. 1981). Samuel G. Levin, the eviction attorney engaged by the Debtor during the Chapter 11 period, was a person whose services may not have been central to the Debtor's case, but whose services were required in the ordinary course of operating the Debtor's business. Therefore his employment and fees did not require prior approval of the Court.

Under §101(54) of the Bankruptcy Code a transfer involving a check occurs at the time the check clears and is honored by the bank on which the check is drawn. *Barnhill v. Johnson,* 503 U.S. 393, 398-99, 112 S. Ct. 1386, 118 L. Ed.2d 39 (1992).

Four of the seven payments for which Kabbani seeks allowance cleared the drawee bank after the Debtor filed its bankruptcy petition. The Reorganized Debtor has stipulated to the allowability of two of such payments. As to the other two payments, because the second check to LOWJF in the sum of $15,000.00 and the third check to LOWJF in the sum of $10,000.00 each cleared the drawee bank after commencement of the Debtor's case those payments constituted post-petition transactions with the Debtor In Possession within meaning of §503(b) of the Bankruptcy Code. The first $10,000 check constituted a pre-bankruptcy transaction that does not qualify as an administrative expense.

The question whether LOWJF's fees constitute a valid and proper administrative expense must be decided in the light of this Court's entry on February 13, 2012 of an order agreed to between the Debtor's attorneys and the Reorganized Debtor/Itasca Bank [dkt no. 220] (the "Agreed Order"). Kabbani did not participate in the agreement. The Agreed Order allowed such fees in the amount of $80,055.00 for fees (but limited by agreement with the Bank to $62,780.00 as costs of administration under § 502(b)(2)) plus $5,137.69 for expenses. Because the amount

of fees thereby allowed as valid and proper administrative expenses exceeded the total of payments by Kabbani to LOWJF the payments made by Kabbani to LOWJF for fees were (as found in the Agreed Order) for necessary and reasonable expenses of administration within meaning of §503(b)(1)(A) and §507 of the Bankruptcy Code.

If Kabbani is not allowed an administrative expense claim for her payments of fees to LOWJF the Debtor would be enriched and the Bank as owner of the business directly benefitted to the extent of Kabbani's payments that allowed for payment of fees due to LOWJF. *In re Lunan Family Restaurants*, 194 B.R. 429, 449 (Bankr. N.D. Ill. 1996) (holding that the purpose of according administrative priority is to prevent unjust enrichment of the debtor's estate).

Based on the evidence Kabbani argues that she holds and should be allowed an administrative expense claim against the estate within the meaning of §§503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code in the total amount of $31,475.00. However, the post-petition payments identified above total only $25,575.00.

In objecting to most of the claimed administrative expenses, 211 Waukegan LLC (the organized Debtor herein) and Itasca Bank and Trust Co. (that now controls the Debtor) first points out that no documents support the contention that the monies provided by Kabbani to Debtor are loans by her. It is true that, as manager of Debtor, Ms. Kabbani administered monies as needed by the Debtor that were used for fees, but no documents were created to show that any of her advances were loans. However, in a closely held business, an advance to meet urgent needs may not necessarily be documented by formal documents.

Itasca further argues that at the time Ms. Kabbani advanced monies to pay Debtor's lawyer, the advances were not then necessary to help the estate because the lawyer would have confirmed their work without such payments. No lawyer in LOWJF testified or represented that the firm would do the necessary work for Debtor without payment.

Kabbani seeks payment of administrative expenses under 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(2). Section 507(a)(2) dictates when an administrative expense must be paid and its priority among creditors. Section 503(b)(1)(A) provides for "allowance" of the expenses. Such expenses are to be allowed only after notice and a hearing.

To prevail, Kabanni needs to show three things:

First, Kabbani must establish that the debt arose after filing of the bankruptcy petition. In this case, this depends on whether the transfers occurred post-petition. In *Barnhill v. Johnson*, 503 U.S. 393, 398–400 (1992), the Supreme Court held in a case to recover a preferential transfer of a bankruptcy debtor's property, that a transfer occurs when the drawee bank honors a check. Itasca Bank mischaracterizes that holding, claiming that the Court held that "a transfer occurs when the funds are available to the payee." (Proposed Findings ¶ 9) It does not matter when the funds were made available to Factor's office; what matters is when the drawee bank honored Kabanni's check. Kabbani established at a hearing as to the $15,000.00 payment and second $10,000.00 check that both checks were honored after filing of Debtor's bankruptcy petition.

Second, Kabbani also needs to establish that the expenses paid were "actual, necessary costs" to "preserve the estate." Allowance of LOWJF fees and expenses as administrative expenses necessarily required a finding herein that those fees and expenses were actual and necessary. *In re Pettibone Corp.*, 74 B.R. 293, 301 (Bankr. N.D. Ill. 1987). Section 503(b)(1)(A) does not enumerate all potential items of expense necessary to "preserve the estate" but does list some costs "including" wages, taxes, and other expenses not relevant here. *Collier on Bankruptcy* advises that these terms should not be read narrowly as many types of costs and expenses have been accepted, so long as they helped to conserve, maintain, or rehabilitate the estate. ¶ 503.06[1]. The term "preservation" may also include any other means of administering the estate, such as an orderly liquidation. *Id.* Fees paid to attorneys for their work to ensure orderly disposition of the Debtor's assets in this case fall within the definition of these terms.

There is no requirement under §§ 503 or 507, as implied by Itasca, that the transfers "were authorized extensions of credit under § 364." (Itasca Bank Proposed Findings ¶ 14) The case cited for that proposition by Itasca expressly states that analysis under the facts in that case would take place under § 364 and not under §§ 503 and 507. *In re Ockerlund Construction Co.*, 308 B.R. 325, 328 (Bankr. N.D. Ill. 2004) (Cox, J.) ("The question raised in the present dispute, however, is not whether proceeds from Mr. Ockerlund's advance were used to cover probable administrative expenses. Rather, the question is whether the advances qualifies as valid post-petition extensions of credit to the Debtor in accordance with 11 U.S.C. § 364(a)–(b)."). As Kabbani argues her payments to Factor consisted of and confirmed a loan, analysis under § 364 is

appropriate, but this is not a requirement under §§ 503 or 507.

Third, Kabbani needs to show either that 11 U.S.C. § 364 does not apply, or that its requirements have been met. Section 364 provides in relevant part:

> (a) If the [Debtor] is authorized to operate the business . . .unless the court orders otherwise, the [Debtor] may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.
>
> (b) The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt [other than in the ordinary course of the debtor's business] allowable under section 503(b)(1) of this title as an administrative expense.

The Debtor did not request approval of its loan with Kabbani under § 364(b). However, without need for notice and hearing, allowance as an administrative expense may be available if such credit was extended in the ordinary course of Debtor's business. Kabbani contends that the Debtor did not need to seek approval of its loan with her under § 364(b) because the extension of credit by her to the Debtor occurred in the ordinary course of the Debtor's business. The critical issue is whether the payments to Debtor's lawyers were made in the ordinary course of the Debtor's business. If payments made by Kabbani to the lawyers for Debtor qualify as a lawful extension of credit under § 364 then they may be allowed as an administrative expense and receive priority under §§ 503(b) and 507(a).

The Bankruptcy Code and legislative history of § 364 do not define the phrase "ordinary course of business." Some courts have adopted a two-prong test to determine whether a transaction is in the ordinary course of business. *E.g.*, *In re Dant & Russell*, 853 F.2d 700, 704–05 (9th Cir. 1988); *In re Poff Constr.*, 141 B.R. 104, 106–07 (W. D. Va. 1991); *In re Lodge America*, 259 B.R. 728, 732 (D. Kan. 2001). The two-part test has a "vertical" and a "horizontal" dimension. Applying this test, courts consider whether the transaction is consistent with the

debtor's prepetition transactions and, second, with transactions in the industry in which the debtor is engaged.

One District Judge in this District rejected the second, "horizontal," test as a matter of statutory construction in *Martino v. First Nat'l Bank (In re Garofalo's Finer Foods)*, 186 B.R. 414, 428–30 (N. D. Ill. 1995). *See also In re Lodge America*, 239 B.R. 580, 583 (Bankr. D. Kan. 1999), *affirmed*, 259 B.R. 728 (D. Kan. 2001). In that case, the District Judge held that a bankruptcy judge erred as a matter of law in adopting the two-prong test described above. *Martino*, 186 B.R. at 424. The *Martino* Opinion held there was no statutory basis for the "horizontal dimension" prong, which looks to industry standards and practices. *See generally id.* at 428–31, *see also In re Ockerlund Constr. Co.*, 308 B.R. 325, 329n.1 (Bankr. N.D. Ill. ) (summarizing and adopting holding in *Martino*).

Courts that have rejected the two-prong test instead adopt a "reasonable expectations" test. *Martino*, 186 B.R. at 425 (citing cases). Under this test, the court looks to the reasonable expectations of creditors dealing with the debtor as to the types and terms of transactions into which the debtor might enter. *See id.* The *Martino* Opinion instructs:

> The core of the reasonable expectations test is its analysis of the debtor's pre-petition conduct as a means to inform and develop expectations of its post-petition conduct. The debtor's pre-petition conduct is not, however, the sole reference for defining these expectations. In applying this test, the court must also consider the changing circumstances that are inherent in a debtor's efforts to operate its business under chapter 11.The test seeks to discern "any significant alterations" in a debtor's pre- and post-petition activities. . . .
>
> A creditor's reasonable expectations of a debtor's "ordinary course of business" are based in large part upon the debtor's specific pre-petition business practices and norms and the expectation that the debtor will conform to those practices and norms while operating as a debtor-in-possession. Thus, a fundamental characteristic of an "ordinary" post-petition business transaction is its similarity to a pre-petition business practice. . . . A rigid similarity is not required; rather, the post-petition transaction must have "some consistency" with a pre-petition transaction. . . . The size, nature and type of business, and the size and nature of the transactions in question are all relevant to determining whether the transactions are ordinary. (citations omitted).

*Martino*, at 186 B.R. at 425–26.

Itasca Bank cites one Bankruptcy Judge in this District for the proposition that, "[p]aying bankruptcy professionals, including an attorney, is not in the ordinary course of business." *In re Addison Properties Ltd.*, 185 B.R. 766, 769 (Bankr. N.D. Ill. 1995) (Wedoff, J.). However, the Itasca's argument misses the point. The issue is not whether the payment of attorney's fees was in the ordinary course of business, but whether it was in the ordinary course of business for Kabbani to extend credit to the Debtor to pay necessary business expenses. *In re Massetti*, 95 B.R. 360, 363 (Bankr. E.D. Pa. 1989). In this case, there is sufficient evidence that Kabbani consistently advanced money to the Debtor to pay needed expenses. *See* Findings of Fact ¶ 9 *supra*. Furthermore, the size and nature of the transactions, while varying in amount, show that there was a similarity between pre- and post-petition transactions of that nature.

Itasca Bank wishes to characterize the transactions between Kabbani and the Debtor as "capital contributions" but cites no evidence or reasoning for such a characterization. Kabbani was never an owner of the Debtor, although she is married to the Debtor's former owner. As described above, Kabbani did seek to purchase the Debtor through the Third Amended Plan of Reorganization. However, the evidence did not identify the fees and expenses paid by her on the Debtor's behalf as capital contributions. (Disclosure Statement to Third Amended Plan of Reorganization, Dkt. No. 84) Kabbani has consistently argued that she believed she was entitled to repayment for her loan to the Debtor for the retainer fees. (Kabbani Motion for Leave to Amend Request for Administrative Expenses ¶¶ 5, 12).

## CONCLUSION

Because the extensions of credit by Kabbani to the Debtor occurred in the ordinary course of the Debtor's business under § 364, they will be allowed as administrative expenses under § 503(b). The Kabbani Motion is granted with respect to the payments of $325.00 (for U.S. Trustee fees) and $250.00 (for tenant eviction) stipulated to by the Bank and to payments advanced post-petition to pay attorney's fees in the total amount of $25,000, for a total of $25.575.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 18th day of September, 2012.